

NUMBER 13-08-281-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

WINSTON COOPER,                                                     Appellant,

v.

R. BRYAN GULLEY, D.D.S.,                                            Appellee.

### On appeal from the 28th District Court
### of Nueces County, Texas.

## MEMORANDUM OPINION

**Before Justices Rodriguez, Garza, and Vela**
**Memorandum Opinion by Justice Vela**

This is an appeal from a directed verdict in a dental malpractice case granted in favor of appellee, R. Bryan Gulley, D.D.S., and against appellant, Winston. By one issue, Cooper complains that the trial court erred in granting the directed verdict on the issue of causation because he produced evidence that Dr. Gulley's treatment was below the standard of care and proximately caused his injuries. We reverse and remand for a new

trial.

## I. BACKGROUND

On April 5, 2005, Cooper saw Dr. Britt Barwise, the owner of Apple Dental Center, for a toothache. Cooper testified that he was in severe pain and that the area around the tooth was "red and . . . swollen," and "started bleeding" when he moved the tooth. Dr. Barwise took some x-rays, but they were inconclusive. During his clinical examination, Dr. Barwise discovered that tooth five was cracked.[1] The x-ray showed some bone loss and a dark mark across the mid-section of tooth four. Tooth four was adjacent to tooth five, the cracked tooth. The crack in tooth five was not visible on the x-ray because it ran vertically. Dr. Barwise found that tooth five was "clinically mobile," that the tooth was separated into two pieces and that it moved "in two different directions." The tooth was split from the top to the bottom but looked "perfectly normal . . . until you actually [applied] force" at which point it separated.

Dr. Barwise referred Cooper to Dr. Gulley, an oral surgeon, that afternoon to have tooth five extracted. He sent a referral card and an x-ray with Cooper to give to Dr. Gulley. The testimony showed that the referral card was like a "prescription" to have the oral surgeon perform a service. Due to a clerical error by Dr. Barwise's staff, the referral card mistakenly indicated that tooth four was to be extracted. Based on the referral card's reference in two different places to remove tooth four and the x-ray showing possible problems with tooth four, Dr. Gulley extracted tooth four. Cooper testified that Dr. Gulley

---

[1]Dentists primarily use one of two numbering systems for identifying a particular tooth, the International System and the Palmer System. Barwise was using the International System which numbers teeth one through sixteen on the top and seventeen through thirty-two on the bottom.

appeared to be very busy and Cooper felt like he removed the tooth "as fast as he could do it." Cooper further testified that he did not believe that Dr. Gulley ever tapped or felt any of Cooper's teeth prior to the extraction of tooth four.

Cooper was initially concerned that the wrong tooth had been extracted when he saw that the extracted tooth was a whole tooth. His suspicion was realized later that evening when the anaesthetic wore off and the severe pain returned. The next morning, Cooper contacted Dr. Barwise, who, upon examining Cooper, confirmed that tooth four had been pulled and that tooth five was still present. Cooper was then referred to a different oral surgeon who extracted tooth five that same afternoon.

Cooper filed suit against both Dr. Gulley and Apple Dental Center. He settled with Apple Dental Center; and it is not a party to this appeal. Cooper's primary claim in the trial court was that because both tooth four and tooth five were removed, he is no longer eligible for a permanent bridge, but instead has to wear a partial denture. During the initial visit, Dr. Barwise and Cooper discussed using a "five-unit-permanent bridge" to replace Cooper's missing teeth.[2] The plan was to use tooth four as an "abutment" tooth and to use a "five-unit-permanent bridge" to fill the empty spaces where teeth three and five should have been. Dr. Barwise testified that although tooth four was not an "ideal abutment," he "did plan on using it as an abutment." Because tooth four was mistakenly extracted, a permanent bridge is no longer a suitable option for Cooper unless he were to get two implants at an approximate cost of $1,800 per implant; he could then get a "three-unit bridge" for "$850" per tooth. Dr. Barwise further testified that whether or not implants were

[2] A "permanent bridge" or "fixed bridge" is not removable; it is permanently placed in the patient's mouth.

3

a viable option would need to be determined by an oral surgeon.

Harold James Seiler, D.D.S., Cooper's expert witness, testified that, "[b]ased upon the length of the span that we now have to cover, a "fixed bridge" "would not be a very good choice." He further opined, based on the x-ray, that tooth four was a "perfectly sound tooth . . . [with] no obvious decay on either side of the tooth" and appeared treatable. Dr. Seiler stated: "there is nothing on the x-ray that I can see that would condemn that tooth needing to be removed." When asked whether tooth four could have served as a proper abutment for a five-unit-permanent bridge, Dr. Seiler replied: "It very well could have"; "it's entirely probable that a bridge could have been placed there;" and "[t]here was no reason why that tooth had to be extracted." Dr. Seiler also testified that Cooper's options after the removal of tooth four include a removable partial denture or a permanent bridge if Cooper were to get implants. Dr. Seiler could not testify to the viability of implants because more information was necessary, but did testify that a permanent bridge with three missing teeth in a row was not a good choice.

Cooper testified that he was thereafter fitted with a removable-partial bridge to fill the vacant spaces of teeth three, four, and five. He said that he has had the bridge for over three years and that it remains uncomfortable, that it makes it difficult for him to speak fast and clear, and that he cannot eat with it in place.

At the close of all of the evidence, while the parties were preparing the jury charge, Dr. Gulley moved for directed verdict on the issue of causation. The trial court granted the motion, and this appeal ensued.

II. DISCUSSION

A.      Standard of Review

In reviewing the trial court's directed verdict or judgment as a matter of law, we conduct a legal sufficiency analysis of the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). Evidence is legally sufficient if:

> the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.

*Id.* at 827.

A court may grant a directed verdict "if no evidence of probative force raises a fact issue on the material questions in the suit." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). There are two specific situations in which a defendant should be granted a directed verdict: (1) when the plaintiff fails to offer evidence of an essential element of the claim; and (2) when the plaintiff "admits or the evidence conclusively establishes a defense to the plaintiff's cause of action." *Id*.

B.      Expert Testimony

In medical malpractice cases, negligence and causation must be established through expert testimony, not on mere conjecture, speculation, or possibility. *Columbia Med. Ctr. of Las Colinas v. Hogue*, 271 S.W.3d 238, 246 (Tex. 2008); *see Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 876 (Tex. 2001); *Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex. 1965). The plaintiff must establish a causal connection between the defendant's negligence and the injuries based upon a "reasonable medical probability." *Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 511 (Tex. 1995); *Lenger*

5

*v. Physician's Gen. Hosp., Inc.,* 455 S.W.2d 703, 706 (Tex. 1970). Proximate cause includes both cause-in-fact and forseeability. *Hogue* at 240. The plaintiff satisfies the cause-in-fact element of proximate cause by presenting proof establishing a direct causal connection between the damages awarded, the defendant's negligence, and the injury suffered. *Texarkana Mem'l Hosp., Inc. v. Murdock,* 946 S.W.2d 836, 838 (Tex. 1997). Cause-in-fact requires that the alleged act or omission be a substantial factor in bringing about the injury and without which, the harm would not have occurred. *Hogue*, 271 S.W.3d at 246. In *Hogue,* the supreme court stated that the words "possibly" and "perhaps" indicate conjecture and speculation. *Id*. at 246. Likewise, the words "can" and "could" do not indicate reasonable medical probability. *Id*.; *see also Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 591 (Tex. 1999). The words "reasonable medical probability" are not required, but the testimony "must demonstrate conduct that to a reasonable degree of medical certainty would have occurred." *Hogue,* 271 S.W.3d at 247*.*

C. Analysis

Dr. Gulley did not move for directed verdict on the lack of expert testimony with respect to either the standard of care or any breach of the standard. Therefore, in our analysis, we address only the evidence offered with respect to causation. Cooper urges that the trial court erred in granting a directed verdict on causation because there was probative evidence that the removal of the wrong tooth caused him to no longer be a candidate for a permanent bridge.[3] Reviewing the evidence under the standards set forth previously in this opinion, we agree. *See Keller*, 168 S.W.3d at 823. Dr. Seiler testified

---

[3]Dr. Seiler opined at trial that Dr. Gulley should have questioned Cooper concerning why he was there. He said that merely because someone sends him a "paper that has a particular number on it, doesn't mean that I don't have to do my due diligence as a doctor to determine that it's necessary and appropriate to take that tooth out."

that there was nothing on the x-ray that would require the removal of tooth four. While he indicated that he would have to know something more about the bone loss and make sure that it was treated appropriately before a bridge was placed, he also opined that tooth four "very well could have" served as a proper abutment tooth for a five-unit-permanent bridge. He stated that "it's entirely probable" that tooth four could have served as an abutment tooth. According to Dr. Seiler, with the extraction of tooth four, a permanent bridge "would not be a very good choice." On cross-examination, Dr. Seiler stated that though tooth four had no obvious decay on either side, and that it may have had some decay or abrasion at the cervical portion of the tooth that appeared to be restorable. Dr. Seiler concluded from his observation that there was no reason to remove the tooth. When asked if Dr. Seiler knew for a fact that if Dr. Gulley had not removed tooth number four, Dr. Barwise would have used the tooth as an abutment for a fixed bridge, Dr. Seiler responded, "I think that was his intent, yes." He agreed with Dr. Barwise that the patient would have to return for further evaluation in order to assess the available options with respect to the bridge.

Dr. Thornton, Dr. Gulley's expert, opined that there was a weakening in the structure of tooth four as well as bone loss. He testified that he would have removed tooth four. He did not view tooth four as a viable abutment tooth because there was bone loss, radiolucency at the tip of the root, and weakness in structure. On cross examination, Dr. Thornton testified that "you can build a house on sand. You can put a crown on that tooth. That doesn't necessarily make it a wise thing to do."

Dr. Barwise stated that he planned on using tooth four as an abutment. He also agreed that although tooth four was not a perfect tooth, given Cooper's age, the tooth was relatively typical and that he "plan[ned] on using that tooth for an abutment." Although Dr.

7

Barwise did not directly state that a permanent bridge was not an option, he clearly implied it: "if tooth four was still there to be used as an abutment . . . my intention was to use it as [an] abutment if the patient so wished."

Dr. Seiler's testimony regarding a permanent bridge was couched in terms of probability, not possibility. Likewise, Dr. Barwise testified that he planned to use tooth four as an abutment. Phrases such as "it's entirely probable" and "planned on using" go beyond conjecture, speculation, and mere possibility and indicate reasonable medical probability. Considering the evidence proffered on the issue of causation under the appropriate standards for granting a directed verdict, we conclude that Cooper's issue must be sustained.

### III. CONCLUSION

We sustain appellant's issue and reverse and remand the case to the trial court.


ROSE VELA
Justice


Memorandum Opinion delivered and
filed this 6th day of August, 2009.